## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**AARION GROSS,**                            CASE NO. 3:25 CV 1162

    Plaintiff,

    v.                                   JUDGE JAMES R. KNEPP II

**UNIVERSITY OF TOLEDO,**

    Defendant.                           **MEMORANDUM OPINION AND ORDER**

### INTRODUCTION

Currently pending before the Court is Defendant University of Toledo's Motion to Dismiss Plaintiff Aarion Gross's First Amended Complaint. (Doc. 9). Plaintiff has not responded to the Motion, and the time in which to do so has expired. *See* Local Civ. R. 7.1(d). Jurisdiction is proper under 28 U.S.C. § 1331. For the reasons set forth below, Defendant's Motion is denied.

### BACKGROUND

Procedural Background

Plaintiff filed his original Complaint on June 4, 2025. (Doc. 1). Defendant moved to dismiss the Complaint pursuant to Federal Civil Rule 12(b)(6), arguing Plaintiff failed to timely exhaust his administrative remedies and therefore failed to preserve his Title VII claims. (Doc. 6). Plaintiff then simultaneously filed a First Amended Complaint (Doc. 7) and an opposition to Defendant's Motion to Dismiss (Doc. 8). The Court denied Defendant's Motion because an "amended complaint super[s]edes the original complaint, thus making the motion to dismiss the original complaint moot." *Ky. Press Ass'n v. Kentucky*, 355 F. Supp. 2d 853, 857 (E.D. Ky. 2005) (citing *Parry v. Mohawk Motors of Mich.*, *Inc.*, 236 F.3d 299, 306 (6th Cir. 2000)).

On September 8, 2025, Defendant filed the instant Motion to Dismiss Plaintiff's First Amended Complaint. (Doc. 9). Plaintiff did not file a response.

Factual Background

The facts presented in the Amended Complaint are accepted as true for the purposes of a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Those facts are as follows.

Plaintiff worked as a Department of Family Medicine ("Department") Full-time Physician Assistant and then as a faculty member of Defendant University of Toledo's College of Medicine and Life Sciences from October 1, 2021, to June 30, 2024. (Doc. 7, at 2). Plaintiff also served as the Diversity Equity and Inclusion ("DEI") Officer for the Department from October 1, 2021, through March 4, 2024. *Id.* In this position, Plaintiff was tasked with developing training programs and strategies to serve minority students and patients, but he was "blocked from properly performing" these tasks by Department staff members "who stated they felt he was receiving special treatment because he was African American and/or gay" and who referred to him as "divisive" and "immature." *Id.* Plaintiff complained to Defendant, but no action was taken. *Id.* In November 2023, Plaintiff made a written discrimination complaint to Defendant. *Id.*

In a December 23, 2023, message to Plaintiff, Defendant[1] cited "vague behavioral deficiencies" as the reason his contract would not be renewed. *Id.* at 3. In a letter dated January 8, 2024, which Plaintiff received from the Department Chair on or about January 10, 2024, the Dean of the College of Medicine and Life Sciences stated Plaintiff's "contract as a faculty member was not being renewed." *Id.* at 2-3; *see also* Doc. 7-1 (letter). The letter stated:

> Based on the notice received from Linda Speer, M.D., your Department Chair, this letter serves as an official notice that your University of Toledo College of

---

1. Plaintiff's Complaint does not indicate who this message was from.

2

> Medicine and Life Sciences faculty appointment will be terminated on June 30, 2024 unless your Department Chair rescinds her request of your termination.
>
> You will continue to receive your full salary and benefits according to the terms of your employment through its expiration of [sic] June 30, 2024.

(Doc. 7-1). "It was stated separately that the non-renewal was not final until June 30, 2024, pending Plaintiff's ability to 'modify his behavior.'" (Doc. 7, at 3). These discussions took place at and around the time of the January 2024 letter. *Id.* Plaintiff had no disciplinary history of any kind with Defendant. *Id.*

During the last six months of his employment with Defendant, Plaintiff "found himself for no apparent reason being denied chances to diversify his medical practice opportunities and to further his medical career objectives." *Id.* He found discussions with the Department Chair and others "regarding modifying his behavior to be demeaning and pointless." *Id.*

On March 4, 2024, "in utter frustration and being heartsick over the discrimination he had endured, Plaintiff resigned his employment in an act of constructive discharge," effective June 30, 2024. *Id.*; *see also* Doc. 7-2 (March 4, 2024, email). His e-mailed resignation to the Department Chair stated:

> Dr. Speer,
>
> I am not sure if I need to provide written notice even with your of your [sic] letter from December.
>
> I am writing to formally resign from my positions as Family Medicine Department DEI Officer and Family Medicine Clinician at the University of Toledo, effective June 30, 2024. This letter serves as my official notice.
>
> After careful consideration, I have decided not to renew my contract, regardless of any potential reconsideration by you. I appreciate the opportunities for growth and development however, it is time for me to pursue new challenges and opportunities in my career.

I want to clarify that I intend to continue my role as a Family Medicine Clinician on the practitioner track. I am committed to providing quality patient care and supporting the department's mission in this capacity.

You can expect me to be dedicated to ensuring a smooth transition during my remaining time with the university.

Thank you once again for the opportunities you have provided me during my time at the University of Toledo.

I wish you and the institution continued success in the future.

Best regards,
Aarion Gross, PA-C (*He/Him/His*)
University of Toledo College of Medicine

(Doc. 7-2).

Plaintiff filed a charge of discrimination with the Ohio Civil Rights Commission ("OCRC") and the Equal Employment Opportunity Commission ("EEOC") on December 23, 2024, citing race discrimination, sex discrimination, and retaliation. (Doc. 7, at 3). On May 30, 2025, the EEOC issued Plaintiff a right to sue notice. *Id.*

In the Amended Complaint, Plaintiff brings race discrimination, sex discrimination, and retaliation claims under Title VII, 42 U.S.C. § 2000e, *et seq.* (Doc. 7, at 3-5).

## STANDARD OF REVIEW

When deciding a motion to dismiss under Federal Civil Rule 12(b)(6), the Court tests the complaint's legal sufficiency. The Court is required to accept the allegations stated in the complaint as true, while viewing the complaint in a light most favorable to the plaintiff. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). Although a complaint need not contain "detailed factual allegations," it requires more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, a complaint survives a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true,

4

to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). And "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also* Fed. R. Civ. P. 8(a)(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief").

## DISCUSSION

Defendant moves to dismiss Plaintiff's First Amended Complaint, arguing: (1) Plaintiff failed to timely exhaust his administrative remedies; and (2) Plaintiff cannot show an adverse action because he does not plausibly allege facts supporting his claim that his resignation was a constructive discharge. (Doc. 9). Although Plaintiff did not respond to Defendant's motion, in his opposition to Defendant's original motion to dismiss, he argued that his filing was timely based on the purportedly tentative nature of the January 8, 2024, letter. (Doc. 8).[2] For the reasons set forth below, the Court denies Defendant's Motion.

Exhaustion

"Before filing suit in federal court, a Title VII plaintiff must first exhaust [his] administrative remedies by filing a charge of discrimination with the EEOC and receiving a right-to-sue letter." *Alexander v. Univ. of Memphis*, 2021 WL 2579973, at *3 (6th Cir.) (citing *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018)). Exhaustion requires a plaintiff to: "(1) timely file a charge of employment discrimination with the EEOC; and (2) receive and act upon the EEOC's statutory notice of the right to sue." *Granderson v. Univ. of Mich.*, 211 F. App'x 398, 400 (6th Cir. 2006). "In Ohio, a person has 300 days after an alleged discriminatory

---

2. In this opposition brief, Plaintiff explained: "This Response is based on Plaintiff's First Amended Complaint filed contemporaneous with this Response. Plaintiff asserts the same legal issues set forth by Defendant will arise with the Amended Complaint and therefore addresses those issues below. " (Doc. 8, at 1).

act to file an administrative charge of discrimination with the EEOC." *Chapman v. Univ. of Toledo*, 2023 WL 8086742, at *3 (N.D. Ohio) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 498 (6th Cir. 2001)); *see* 42 U.S.C. § 2000e-5(e)(1) (providing that in a state with its own fair employment practices agency, the EEOC's administrative filing period is 300 days).

"The EEOC exhaustion requirement is not jurisdictional; instead, it is a claim-processing rule." *Alexander*, 2021 WL 2579973 at *3 (citing *George v. Youngstown State Univ.*, 966 F.3d 446, 469 (6th Cir. 2020); *Adamov v. U.S. Bank Nat'l Ass'n*, 726 F.3d 851, 855-56 (6th Cir. 2013)). "But a claim-processing rule must be enforced if properly raised by the employer." *Alexander*, 2021 WL 2579973 at *3 (citing *Hamer v. Neighborhood Hous. Servs. of Chicago*, 138 S. Ct. 13, 17 (2017)).

The filing period begins to run when the aggrieved person "learns of the employment decision itself." *Amini*, 259 F.3d at 499. The "proper focus is upon the time of the *discriminatory acts,* not upon the time at which the *consequences* of the acts became most painful." *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) (internal quotation marks omitted).

If as Defendant asserts, the 300 days began to run on the date Plaintiff received the letter (January 10, 2024), the filing period expired November 5, 2024, and the EEOC charge, dated December 23, 2024, was untimely. If instead, as Plaintiff asserts, the 300 days began on the date of Plaintiff's resignation email (March 4, 2024), the EEOC charge was timely.

In *Ricks*, the plaintiff professor claimed the defendant college denied him academic tenure because of his national origin. The Supreme Court rejected Ricks' argument that the limitations period did not begin to run upon notification of the adverse tenure decision because the "letter explicitly held out to Ricks the possibility that he would receive tenure if the Board sustained his grievance." 449 U.S. at 260. *Ricks* instead held the cause of action accrued when

6

Ricks received notice he would be terminated, regardless of whether the letter was equivocal in holding out the possibility that he might receive tenure and thereby avoid termination. *Id.*;[3] *see also Lyons v. Metro Gov't of Nashville & Davidson Cnty.*, 416 F. App'x 483, 491 (6th Cir. 2011) (finding the pendency of a grievance does not toll the limitations period for a civil rights claim under § 1983).

The Sixth Circuit has held "employment decisions which are 'somewhat ambiguous with respect to . . . finality' still trigger the statute of limitations." *Janikowski v. Bendix Corp.*, 823 F.2d 945, 947 (6th Cir. 1987) (alteration in original) (quoting *Kessler v. Bd. of Regents*, 738 F.2d 751, 755 (6th Cir. 1984)). In *Janikowski*, the plaintiff was informed his position was eliminated due to a reduction in force and he would be terminated if he "ha[d] not secured a position elsewhere within [the company];" his employer encouraged him to apply for positions both inside and outside the company. *Id.* at 946. When the plaintiff did not obtain a new position, he was terminated. *Id.* The Sixth Circuit explained that "plaintiff's search for other employment with [the company] was an attempt to avoid the consequences of the termination" and the original notification of the elimination of his position triggered the statute of limitations. *Id.* at 948.

In *Kessler*, a resident physician employed by a university resigned in August 1980, claiming the university had breached its contract with her. 738 F.2d at 753. She requested a hearing, but two days later "was terminated by the [u]niversity in a manner which ignored both her attempted resignation and the [u]niversity procedures for terminating employees for cause." *Id.* She attempted to appeal, but contends she was not provided with due process and "that she

---

3. The *Ricks* Court explained that it did not create a bright line rule. This is so because "[c]omplaints that employment termination resulted from discrimination can present widely varying circumstances," and "[t]he application of the general principles discussed herein necessarily must be made on a case-by-case basis." *Ricks,* 449 U.S. at 258 n.9

was not even informed of the reason for her termination until March, 1981, two months after the President of the [u]niversity upheld her termination." *Id.* In May 1981, the Chancellor upheld the plaintiff's termination. *Id.* And, by letter dated June 30, 1981, the Board of Regents upheld the termination, stating: "In reference to our previous correspondence concerning the appeal by Dr. Mary Kessler, this is to advise that the Board found no basis to reverse the decision of the Chancellor at its June 26, 1981 meeting." *Id.* at 755. Citing *Ricks*, the Sixth Circuit explained "[t]he issue that is disputed is when Kessler's cause of action actually accrued. When allegations of discrimination involve a termination from employment, the critical date is the date of termination; the existence of a grievance procedure does not change the importance of this date." *Id.* at 754. The plaintiff argued the June 1981 letter "did not state that any decision had been made, much less a final decision," and argued her cause of action did not accrue until she received a letter from the Governor in December 1981 confirming the finality of the June 1981 letter. *Id.* The university argued the June 2021 letter was the triggering event for the statute of limitations. *Id.* The Sixth Circuit agreed with the university:

> Although this letter is somewhat ambiguous with respect to its finality, it does indicate that the Board decided to uphold Kessler's termination at its June 26, 1981 meeting. Kessler is correct that the letter gives no indication whether the Board intended to consider the matter further. Nor does the letter clearly state that the Board voted to uphold Kessler's termination. It simply states that it found no basis to reverse her termination. The letter's ambiguous wording is not sufficient, however, to prevent Kessler's cause of action from accruing on June 30, 1981.

> In *Ricks*, as noted earlier, the Board's June 26, 1974 letter indicated a willingness to change its prior decision of Ricks' grievance was found to be meritorious. Yet, that letter was deemed to commence the running of the limitations period. In the case at bar, the Board gave no indication that it would give any further consideration to Kessler's complaints. Therefore, the June 30 letter sufficiently apprised Kessler that her termination was upheld. Based on *Ricks*, even if the Board had specifically stated in its June 30 letter that its decision was *not* final, it would have been sufficient to commence the running of the limitations period.

*Id.* at 755-56.

*Ricks* and *Keller* involve appeals processes of otherwise final termination decisions, and *Jankowski* involves a termination that was final unless the plaintiff secured a new job. But here, Plaintiff alleges he received a letter stating that his "faculty appointment will be terminated on June 30, 2024 unless [his] Department Chair rescinds her request of [his] termination." (Doc. 7-1). But he *additionally* alleges that around the same time as this letter, "[i]t was stated separately that the non-renewal was not final until June 30, 2024, pending Plaintiff's ability to 'modify his behavior.'" (Doc. 7, at 3). Other courts have explained that "a tentative conclusion subject to revision based on future performance differs in character from an employment conclusion subject to appeal on the basis of a record of previous performance as in *Ricks*." *Colgan v. Fisher Scientific Co.*, 935 F.2d 1407, 1420 (3d Cir. 1991).

Although a close call, the Court finds – at the pleading stage – Plaintiff has plausibly alleged that the termination decision was not final at the time of the January 2024 letter. Unlike *Ricks*, where "[t]he grievance procedure, by its nature, is a remedy for a prior decision," 449 U.S. at 261, Plaintiff plausibly alleges he was provided "an opportunity to *influence* that decision before it is made," *id.*, and that his termination was "subject to revision based on future performance," *Colgan*, 935 F.3d at 1420. Thus, the Court denies Defendant's Motion to Dismiss on this basis.

Constructive Termination

Defendant further argues that even if Plaintiff timely exhausted his administrative remedies, he has not plausibly alleged an adverse employment action. This is so, Defendant contends, because Plaintiff voluntarily resigned and he has not alleged facts supporting his characterization that such resignation was a constructive discharge. Because Plaintiff did not respond to Defendant's renewed Motion, he did not respond to this argument.

Title VII prohibits employers discriminating on the basis of race or sex. 42 U.S.C. § 2000e-2. It also prohibits "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment," or "limit[ing] . . . or otherwise adversely affect[ing] [an individual's] status as an employee, because of such individual's race . . . [or] sex." 42 U.S.C. § 2000e-2(a). Title VII also prohibits employers from retaliating against individuals for opposing or reporting discrimination. 42 U.S.C. § 2000e-3(a). "In any kind of employment-discrimination and retaliation case, one essential element that the plaintiff must prove is that he suffered an adverse employment action." *Gorbe v. City of Lathrup Vill.*, 2022 U.S. App. LEXIS 11685, at *12 (6th Cir.) (citing *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004)). While "[t]he 'materially adverse action' element of a Title VII retaliation claim is substantially different from the 'adverse employment action' element of a Title VII race [or sex] discrimination claim," *Laster v. City of Kalamazoo*, 746 F.3d 714, 719 (6th Cir. 2014), Plaintiff's Complaint relies on constructive discharge for both. And "[a] voluntary resignation is not an adverse employment action unless the plaintiff can prove that he was constructively discharged." *Gorbe*, 2022 U.S. App. LEXIS 11685, at *12. (citing *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 554-55 (6th Cir. 2008)).

"A constructive discharge claim has two basic components: discrimination by an employer so severe that a reasonable person would have been compelled to resign and an actual resignation." *Gosbin v. Jefferson Cnty. Comm'rs*, 725 F. App'x 377, 387 (6th Cir. 2018) (citing *Green v. Brennan*, 578 U.S. 547, 555 (2016)). To establish a claim of constructive discharge, "the plaintiff must prove both that '(1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person; and (2) the employer did so with the intention of forcing the employee to quit.'" *Id.* (quoting *Logan v. Denny's, Inc.*, 259 F.3d 558, 568-69 (6th

Cir. 2001)).[4] "The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Green*, 578 U.S. at 555 (citing *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004)); *see also Suders*, 542 U.S. at 147-48 (referring to the alleged conduct as "a 'worse case' harassment scenario, harassment ratcheted up to the breaking point").

Here, Plaintiff's Amended Complaint alleges he was "blocked from properly performing" his assigned DEI position by staff members "who stated they felt he was receiving special treatment because he was African American and/or gay" and who referred to him as "divisive" and "immature." (Doc. 7, at 2).  He further asserts he complained of this treatment "but nothing was done to stop this from happening and Plaintiff was discouraged from complaining further." *Id.* Plaintiff's Complaint alleges he had no disciplinary history and the reasons cited for his non-renewal were "vague behavioral deficiencies." *Id.* at 3. He contends he was "for no apparent reason . . . denied chances to diversify his medical practice opportunities and to further his medical career objectives" as well as that the conversations "regarding modifying his behavior"

---

4.  The Sixth Circuit has identified several factors courts must consider when evaluating the first requirement:

> Whether a reasonable person would have felt compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan*, 259 F.3d at 569 (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)).

were "demeaning and pointless." *Id.* Finally, he asserts he resigned "in utter frustration and being heartsick over the discrimination he had endured." *Id.*

Viewing these allegations as a whole and construing them in Plaintiff's favor, the Court finds Plaintiff has plausibly alleged that the discrimination was so severe, it led him to resign and his resignation was a constructive discharge. Defendant's Motion to Dismiss on this basis is also denied.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendant's Motion to Dismiss (Doc. 9) be, and the same hereby is, DENIED.

 s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: January 29, 2026